**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 29, 2025**

# In the Court of Appeals of Georgia

A25A0686. IN THE INTEREST OF G. N. N., A CHILD (MOTHER).

HODGES, Judge.

In June 2024, the Juvenile Court of Jefferson County terminated J. N.'s ("Mother") parental rights to her four-year-old son, G. N. N.[1] Mother appeals, arguing that: (1) the juvenile court's termination order was not supported by clear and convincing evidence; (2) the court's finding that termination of parental rights was in G. N. N.'s best interest was inconsistent with a finding that termination was not in the best interest of G. N. N.'s siblings, who were previously placed in a guardianship with their maternal grandmother; (3) the Jefferson County Department of Family and

---

[1] In the same order, the juvenile court also terminated G. N. N.'s father's parental rights, but the father is not a party to this appeal.

Children Services ("DFCS") failed to make reasonable efforts to remedy the underlying causes of G. N. N.'s dependency; and (4) terminating her parental rights was not in G. N. N.'s best interest because it severed G. N. N.'s relationship with certain, unnamed extended family. We find no error and affirm.

"On appeal from a termination order, we view the evidence in the light most favorable to the juvenile court's ruling to determine whether any rational trier of fact could have found by clear and convincing evidence that the parent's rights should be terminated." (Citation and punctuation omitted.) *In the Interest of N. P.*, 363 Ga. App. 879, 890-891 (2) (872 SE2d 501) (2022).

> Nonetheless, this deferential standard of review is tempered by the fact that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. The right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances.

(Citation omitted.) *In the Interest of B. R. J.*, 344 Ga. App. 465 (810 SE2d 630) (2018).

So viewed, the record reveals that Mother's history with DFCS began in December 2019 with a report of domestic violence against Mother by G. N. N.'s

father ("Father"). A second report of domestic violence by Father against Mother occurred in March 2020, and DFCS learned of additional incidents during its ensuing investigation. At the time, Mother had two children and was pregnant with G. N. N. On September 2, 2020, Mother consented to a protective order against Father to ensure the safety of her two older children.

Shortly after G. N. N. was born on September 4, 2020, DFCS filed a dependency petition as to G. N. N., and Mother again consented to a protective order. Although the protective orders were dismissed in May 2021, DFCS requested emergency custody of the Mother's children, including G. N. N., in August 2021 after another episode of domestic violence against Mother by Father in late July 2021. In September 2021, Mother and Father stipulated to a dependency finding and consented to G. N. N. entering foster care;[2] G. N. N. has been in foster care since September 15, 2021. G. N. N.'s initial permanency plan required the parents to complete a number of tasks, including completing parental fitness psychological and behavioral assessments and following the recommendations of the providers, refraining from domestic violence, visiting G. N. N. consistently to establish and

_____

[2] In view of her stipulation, Mother did not appeal the juvenile court's original finding of dependency.

maintain a bond with G. N. N., paying child support, cooperating with DFCS, and establishing and maintaining housing and income to meet both the parents' needs and G. N. N.'s needs. In the months that followed, however, Mother "had ample opportunity to complete the required recommendations to be reunified with [G. N. N.] and [had] failed to do so."

As a result, DFCS changed G. N. N.'s permanency plan from reunification to a concurrent plan of reunification and termination of parental rights followed by adoption in November 2022. On the same day, the juvenile court terminated Father's visitation with G. N. N. due to his arrest for the September 2022 aggravated stalking of Mother.[3] Mother's compliance with her requirements under the permanency plan improved while Father was incarcerated, even earning her unsupervised visits with G. N. N. in March 2023. However, Mother reverted to her prior poor performance upon Father's release. Despite the termination of Father's rights to visit with G. N. N.,

---

[3] Father's conduct resulted in the issuance of a 12-month temporary protective order. In May 2023, Mother completed an affidavit in which she asked to drop the charges for aggravated stalking against Father because she did not want him to serve a lengthy prison sentence.

Mother allowed Father to visit with G. N. N. through FaceTime.[4] As a result, DFCS moved to suspend Mother's unsupervised visits in May 2023, which the juvenile court granted.

Over the course of the next few months, DFCS contended that Mother did not complete parenting education or counseling, provide financial support for G. N. N., or establish and maintain safe and appropriate housing or verifiable income. Following Mother's continuing failure to comply fully with her reunification plan, DFCS filed a petition to terminate Mother's parental rights in August 2023. In support of its petition, DFCS alleged that Mother failed to: (a) support G. N. N. financially; (b) visit G. N. N. consistently; and (c) over the course of six months, develop and maintain a parental bond with G. N. N., provide for G. N. N.'s care and support, and comply with the reunification plan. Mother did not file an answer to DFCS's petition. Following a hearing, the juvenile court entered an order terminating Mother's parental rights to G. N. N., concluding that Mother: (a) failed to pay child support as

---

[4] There was also testimony, which Mother hotly contested, that she allowed G. N. N. to visit with Father at a local fair and that Father had given G. N. N. a toy basketball during the visit. Mother denied the encounter and claimed that she had given the basketball to G. N. N., but the juvenile court did not find her testimony credible.

previously ordered; (b) abandoned G. N. N.; and (c) was the cause of G. N. N.'s dependency due, in part, to the history of domestic violence with Father and her failure to extricate herself from his influence. . We granted Mother's application for discretionary appeal, and this appeal followed.[5]

1. Considering Mother's second enumeration first,[6] she argues that DFCS failed to present clear and convincing evidence in support of its termination petition. We disagree.[7]

---

[5] Four days prior to the entry of the juvenile court's termination order, DFCS filed a notice of change of placement shifting G. N. N.'s placement from his foster home to his maternal grandfather "so that the child can reside with relatives." G. N. N.'s guardian ad litem objected to the proposed change in placement, as did G. N. N.'s foster parents. In August 2024, the juvenile court entered an order maintaining the status quo for G. N. N. while Mother's appeal remained pending.

[6] See, e.g., *Heyman v. Heyman*, No. A24A1277, 2025 Ga. App. LEXIS 125, at *9 (1), n. 3 (Ga. App., March 12, 2025) ("For convenience of discussion, we have taken the enumerated errors out of the order in which appellant has listed them.") (citation and punctuation omitted).

[7] Although Mother included citations to the record in the "Statement of Facts and Procedural History" section of her appellant's brief, we note that the argument in support of this enumeration of error does not include any such citations. See Court of Appeals Rule 25 (d) (1) (i) ("Each enumerated error shall be supported in the brief by specific reference to the record or transcript. In the absence of a specific reference, the Court will not search for and may not consider that enumeration.").

"The decision to terminate parental rights is a two-step process." *In the Interest of C. A. B.*, 351 Ga. App. 666, 671 (2) (832 SE2d 645) (2019). First, the court must determine whether any of the five grounds codified at OCGA § 15-11-310 (a) have been met, including, relevant to this appeal: (1) the parent wantonly and willfully failed to pay child support for a period of 12 months or longer; (2) a child is abandoned by the parent; or (3) a child is dependent due to lack of proper parental care or control by the parent, reasonable efforts to remedy the circumstances of dependency have been unsuccessful, the cause of dependency is likely to continue or will not likely be remedied in the reasonably foreseeable future, and either returning the child to the parent or continuing the parent-child relationship would be likely to cause the child serious physical, mental, moral, or emotional harm. See OCGA § 15-11-310 (a) (3) - (5). Importantly, "[t]hese grounds are independent, and thus, on appeal, if there is sufficient evidence supporting any one of these grounds, we need not consider the other grounds in order to affirm." (Citation and punctuation omitted.) *In the Interest of C. A. B.*, 351 Ga. App. at 671-672 (2). Second, "[i]f one of the above grounds has been established, the juvenile court shall then consider whether termination of

parental rights is in the child's best interest." Id. at 672 (2); see also OCGA § 15-11-310 (b).

In its order granting DFCS's termination petition, the juvenile court concluded that there were three independent bases upon which to terminate Mother's parental rights: (a) the failure to pay child support; (b) abandonment; and (c) dependency. However, Mother only clearly challenges the termination order as to G. N. N.'s dependency.[8] See OCGA § 15-11-310 (a) (5). Accordingly, if there is clear and convincing evidence supporting at least one additional ground, the termination order must be affirmed. See *In the Interest of I. H. H.*, 345 Ga. App. 808, 811 (815 SE2d 133) (2018) ("Grounds that are not attacked as erroneous will not be considered on appeal and are presumed to be binding and correct. An appellant's failure to attack alternative bases for a judgment results in the affirmance of that judgment.") (citation and punctuation omitted); see also *In the Interest of C. A. B.*, 351 Ga. App. at 671-672 (2); cf. *Hewitt v. Community & Southern Bank*, 324 Ga. App. 713, 716 (2) (751 SE2d 513) (2013).

---

[8] Mother makes only a cursory argument contesting the abandonment finding. See OCGA § 15-11-310 (a) (4).

(a) *Failure to Pay Child Support.* One of the statutory grounds for termination of parental rights a court must consider is whether "[t]he parent has wantonly and willfully failed to comply for a period of 12 months or longer with a decree to support his or her child that has been entered by a court of competent jurisdiction of this or any other state[.]" OCGA § 15-11-310 (a) (3). Here,

> [M]other has failed to enumerate as error and challenge on appeal the juvenile court's determination that the evidence supported a finding of [failure to pay child support] by . . . [M]other as a statutory ground for terminating her parental rights. Therefore, . . . [M]other has waived on appeal her right to challenge the juvenile court's finding as to this ground on appeal.

*In the Interest of I. H. H.*, 345 Ga. App. at 811; see also *Hewitt*, 324 Ga. App. at 716 (2). Thus, as termination of Mother's parental rights was justified upon her failure to pay child support as ordered, we affirm the juvenile court's order terminating Mother's parental rights to G. N. N.

(b) *Abandonment.* "Although we are not required to do so, we exercise our discretion to review . . . [M]other's challenge to the termination of her parental rights under OCGA § 15-11-310 (a) [(4)]." *In the Interest of R. E. M. B.*, 374 Ga. App. 564, 568 (2) (— SE2d —) (2025). See n. 8, supra.

A separate and independent statutory ground for termination that a court may consider is whether "[a] child is abandoned by his or her parent[.]" OCGA § 15-11-310 (a) (4). "Abandonment" is defined as "any conduct on the part of a parent . . . showing an intent to forgo parental duties or relinquish parental claims." OCGA § 15-11-2 (1). "Significantly, to constitute abandonment, the conduct must actually show an intent to abandon in light of the rest of the record." (Citation and punctuation omitted.) *In the Interest of C. S.*, 354 Ga. App. 133, 137 (1) (840 SE2d 475) (2020). Statutory examples of the "[i]ntent to forgo parental duties or relinquish parental claims" include the failure, for a period of at least six months, "to communicate meaningfully with a child[,]" "to maintain regular visitation with a child[,]" or "to participate in any court ordered plan or program designed to reunite a child's parent . . . with . . . her child[.]" OCGA § 15-11-2 (1) (A), (B), (D).

Here, testimony indicated that a behavior specialist conducted Mother's assessments in the areas of parental fitness, domestic violence, and substance abuse. As a result of the assessments, the specialist made a number of recommendations, including parental training, behavioral training, and individual therapy to enable Mother to parent more effectively. The specialist also suggested that Mother create

a child-safe environment for G. N. N., model appropriate and healthy communication and conflict resolution skills, and insure that G. N. N. was not exposed to domestic violence.

In addition, Dr. Laurie Jolly, a clinical social worker, testified that Mother initially participated in her counseling sessions beginning in January 2022 and that she was initially attentive and responsive; eventually, however, she "just dropped off and quit answering" when Dr. Jolly tried to reschedule sessions for which Mother did not appear. Mother's last session was in August 2023, and she never completed the necessary counseling. After Mother discontinued her counseling sessions in August 2023, she did not contact Dr. Jolly to re-establish counseling, and Dr. Jolly's efforts to reach Mother were unsuccessful. Importantly, Dr. Jolly noted that she had concerns about Mother's protective capacity for herself and G. N. N., since she had been in a relationship characterized by domestic violence for some time, and that G. N. N. had been exposed to acts of domestic violence. Dr. Jolly also observed that Mother was "very guarded" and never "let her guard down enough to really work on the issues that she really needed to work on."[9]

---

[9] For example, Mother did not disclose Father's aggravated stalking arrest to the counselor.

Finally, Mother's DFCS case manager testified that she had been working with Mother and Father since February 2020 and that DFCS gave Mother a reunification plan in April 2022. The plan included the need for parental fitness, domestic violence, and substance abuse assessments, which Mother completed. As a result of the substance abuse assessment, the plan required Mother to participate in drug screens and maintain negative drug screens. However, the last screen Mother completed was in September 2022, and she refused a screen as late as October or November 2023. Out of 27 screens between August 2021 and September 2022, Mother tested positive for alcohol, marijuana, or oxycodone in 11 screens; she tested positive for alcohol in each of her final five screens. The frequency of the screens for alcohol, as well as the timing, suggested that Mother often consumed alcohol.

Mother did complete her parenting education, but never completed a psychological evaluation for which she received a referral or her counseling with Dr. Jolly. Mother's case manager attempted to contact her concerning her reasons for discontinuing her services with Dr. Jolly, but received no response. Mother also refused to speak with the case manager by telephone, instead resorting to email and text messages. Similarly, Mother made changes to her supervised visitation with G.

N. N. without contacting DFCS, and her visitation with G. N. N. had been inconsistent at the time of the termination hearing. She stated that her visitation was supposed to be once a week, but that she would need to make up visits due to her work schedule. Although Mother had maintained stable housing for the preceding six months, the case manager testified that Mother failed to provide verification for her employment and her income, pay child support, or allow DFCS to inspect her home.

For her part, Mother denied continuing to be in a relationship with Father as early as her initial assessments in August 2021 and claimed that she discontinued the counseling sessions because she "wasn't gettin[g] anything out of it" and that, despite her prior participation, DFCS was still trying to terminate her parental rights — so, in her words, "what's the point. . . ." She further acknowledged that she did not provide any proof of income to her case manager because she "was getting paid direct deposit" and attributed her discontinuation of drug screens to "rebellio[n]" and "stubborn[ness]" even though she knew that counseling was a part of her reunification plan. Nor had she purchased clothes for G. N. N. in months, instead looking to the foster parents to provide financial assistance to G. N. N. She added that she "hardly get[s] to see [G. N. N.]" and that she "never . . . saw [G. N. N.] wear the

13

stuff that [she] was gettin[g] him." Mother stated that she loved her children and that she "should not be penalized for stuff that [she] did in [her] past[,]" emphasizing that she had not done anything "that bad to deserve to get [her] rights terminated. . . ." Notably, Mother also stated that she was not saying that G. N. N. should be returned to *her* care, but that he "could at least be with his family, his siblings, [and] the people that really love him."[10]

As a result, the juvenile court determined that DFCS demonstrated by clear and convincing evidence that Mother abandoned G. N. N. by, for a period of six months, failing to: (1) communicate meaningfully with G. N. N.; and (2) "participate in a court-ordered plan designed to reunite [Mother] with [G. N. N.]."

Our review confirms that Mother's abandonment of G. N. N. was demonstrated by a variety of factors. First, Mother admitted that she "hardly get[s] to see" G. N. N. and that she only visited with him on an irregular basis although she recognized that she was supposed to visit him weekly. Second, Mother acknowledged — somewhat defiantly — that she had not progressed with her reunification plan. In

---

[10] Mother also stated that she was not "discrediting" G. N. N.'s foster parents, because she knew that they took good care of him and loved him, but that she believed that G. N. N. should be with her family instead so that he would not later question his racial identity.

14

that vein, the record demonstrates that Mother discontinued her counseling services with Dr. Jolly; refused to participate in any drug screens after September 2022 due to "rebellio[n]" and "stubborn[ness]"; refused to engage with DFCS's representatives over the telephone or to arrange inspections of her home; failed to pay child support despite maintaining gainful employment; failed to complete recommendations resulting from her initial assessments, including parental fitness, domestic violence, and substance abuse evaluations; and failed to verify her income with DFCS as required. In short, Mother's case manager testified that the only portions of Mother's reunification plan that Mother completed were attending parenting education and obtaining stable housing. Compounding Mother's inaction on her reunification plan was her knowledge, based upon her prior experience, that successful progress on the plan would result in G. N. N.'s return to her care — and yet she failed to progress as required. As the juvenile court aptly noted, "[t]he filing of the termination of parental rights petition . . . should have motivated [Mother] to improve her relationship with [G. N. N.]. Instead, . . . [M]other's progress on her case plan declined." But perhaps most damning, Mother herself stated during her testimony that she was not arguing that G. N. N. should be returned to *her* care, but to the care of her extended family.

Based upon the entirety of the record, then, we conclude that there was clear and convincing evidence of Mother's abandonment of G. N. N. See *In the Interest of I. H. H.*, 345 Ga. App. at 810. As a result, we cannot say that the juvenile court erred in concluding that Mother, despite the availability of services, abandoned G. N. N. by, for a period of six months, failing to: (1) communicate meaningfully with G. N. N.; and (2) "participate in a court-ordered plan designed to reunite [Mother] with [G. N. N.]."

(c) *G. N. N.'s Best Interest.* Having found that two statutory grounds for termination of parental rights were shown by clear and convincing evidence, we next turn to whether termination of Mother's rights was in G. N. N.'s best interest. See OCGA § 15-11-310 (b). This evaluation involves consideration of a number of factors, including:

> (1) Such child's sense of attachments, including his or her sense of security and familiarity, and the continuity of affection for such child;

> (2) Such child's wishes and long-term goals;

> (3) Such child's need for permanence, including his or her need for stability and continuity of relationships with a parent, siblings, and other relatives;

16

(4) Any benefit to such child of being integrated into a stable and permanent home and the likely effect of delaying such integration into such stable and permanent home environment;

(5) The detrimental impact of the lack of a stable and permanent home environment on such child's safety, well-being, or physical, mental, or emotional health;

(6) Such child's future physical, mental, moral, or emotional well-being; and

(7) Any other factors, including the factors set forth in Code Section 15-11-26, considered by the court to be relevant and proper to its determination.

OCGA § 15-11-310 (b).

At the time of the January 2024 termination hearing, G. N. N. had been in foster care for approximately two-and-a-half years. The specialist who administered Mother's assessments warned that G. N. N.'s continued exposure to domestic violence in Mother's home would be harmful, potentially causing him physical conditions, outbursts of anger, and to mimic Father's behavior. In contrast, Mother's case manager testified that G. N. N. had permanency and stability with his foster parents, with whom he was "extremely bonded[,]" calling them "mom and dad[.]"

17

She described G. N. N.'s foster home as his "safe place" and his "security" and that his foster family provides "love, structure, safety, [and] wellbeing." The case manager added that Mother's inconsistent visits with G. N. N. had not been mentally or physically healthy for him. Finally, she noted that G. N. N. communicates regularly with his two siblings, who reside with their maternal grandmother.

All in all, the record demonstrates that G. N. N. was thriving in his foster home and that returning him to Mother and the resulting potential exposure to domestic violence would be harmful to his well-being. DFCS asserted that G. N. N.'s best interest would be to "find permanency in a safe and stable home" rather than lingering "in foster care waiting on [his] parents to comply" with the reunification plan. Therefore, we conclude that "the collective evidence provided a sufficient basis for the court to conclude that termination of . . . [M]other's rights was in the best interest of the child." *In the Interest of C. A. B.*, 351 Ga. App. at 673 (2) (c).[11]

(d) *Dependency*. Because Mother has not appealed the juvenile court's findings related to her failure to pay court-ordered child support for G. N. N., and because we

---

[11] For these same reasons, Mother's argument that terminating her parental rights to G. N. N. was not in the child's best interest because it "forever sever[ed] the relationship between [G. N. N.] and his extended family, with whom he has a deep bond and connection" is unavailing.

conclude that there was clear and convincing evidence to support the juvenile court's termination order as to Mother's abandonment of G. N. N., we need not consider Mother's arguments concerning the juvenile court's termination order based upon OCGA § 15-11-310 (a) (5). See *In the Interest of I. H. H.*, 345 Ga. App. at 811.

2. Next, Mother contends "[a] finding that the termination of parental rights was in the best interests of [G. N. N.] is inconsistent with a finding that such termination was *not* in the best interest in the cases of [G. N. N.]'s siblings, which is a required finding under the Permanent Guardianship statute." (Emphasis in original.) As a result, Mother characterizes the termination of her parental rights to G. N. N. as an "inconsistent [judgment]." As a threshold matter, Mother has not cited any relevant authority in support of this specific proposition. See Court of Appeals Rule 25 (a) (7) ("At a minimum, the appellant's brief must include . . . [t]he argument, which must cite the authorities relied on. . . ."); see also *Moxie Capital, LLC v. Delmont 21, LLC*, 363 Ga. App. 152, 153 (869 SE2d 127) (2022) (noting that arguments must be supported by "citation to *relevant* authorities") (emphasis in original). More importantly, however, to the extent there is an order from the juvenile court placing G. N. N.'s siblings, who have a different father, in a permanent

guardianship, Mother has not cited to any such order in the record. See Court of Appeals Rule 25 (d) (1) (i) ("Each enumerated error shall be supported in the brief by specific reference to the record or transcript. In the absence of a specific reference, the Court will not search for and may not consider that enumeration."). As a result, Mother asks us to address a purely academic question in a vacuum. That is not an enumeration of error that we can review. See OCGA § 5-6-40; *Felix v. State*, 271 Ga. 534, 539 (523 SE2d 1) (1999) ("An error of law has as its basis a specific ruling made by the trial court. In order for a Georgia appellate court to review a trial court ruling for legal error, a party must set forth in the enumeration of errors the allegedly erroneous ruling."); *Cousin v. Tubbs*, 353 Ga. App. 873, 876 (1), n. 10 (840 SE2d 85) (2020) ("It is the appellant's burden, as the party challenging the ruling below, to affirmatively show error from the record on appeal.") (citation and punctuation omitted). Therefore, we do not consider Mother's argument.[12]

3. Without citing any ruling addressing, much less any authority supporting or a discussion of, her specific argument, Mother next asserts that DFCS did not make

---

[12] Even so, we note that Father was not the father of G. N. N.'s siblings, and the record contains testimony that certain relatives were willing to offer placement for G. N. N.'s siblings, but not for G. N. N. due to Father's "anger issues" and his prior threats to harm or kill the relatives.

reasonable efforts to remedy the underlying causes of G. N. N.'s dependency by failing to match Mother with an appropriate counselor. Because this argument is related to the juvenile court's termination order based upon OCGA § 15-11-310 (a) (5) — which we need not consider in view of our conclusion in Division 1, supra — Mother's argument is immaterial and we do not address it.

In sum, Mother did not appeal the juvenile court's conclusion that the evidence supported termination of parental rights based upon the statutory ground of failure to pay child support for G. N. N. See OCGA § 15-11-310 (a) (3). As a result, the juvenile court's order must be affirmed. See *In the Interest of I. H. H.*, 345 Ga. App. at 811; see also *Hewitt*, 324 Ga. App. at 716 (2). Moreover, although not required, we further conclude that clear and convincing evidence supported the juvenile court's conclusions that termination was warranted based upon Mother's abandonment of G. N. N., see OCGA § 15-11-310 (a) (4), and that termination of her parental rights was in G. N. N.'s best interest. Therefore, for the foregoing reasons, we affirm the juvenile court's order terminating Mother's parental rights to G. N. N.

*Judgment affirmed. McFadden, P. J., and Pipkin, J., concur.*